# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Nadine J. Thiele,                                       Civ. No. 10–4871 (JJK)

        Plaintiff,

v.                                                      **MEMORANDUM
                                                        OPINION AND ORDER**

Michael J. Astrue,
Commissioner of Social
Security,

        Defendant.

Frank W. Levin, Esq., counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Nadine Thiele seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability–insurance benefits and supplemental security income. This matter is before the Court on the parties' cross–motions for summary judgment. (Doc. Nos. 12, 17). The parties have consented to this Court's exercise of jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c), and Federal Rule of Civil Procedure 73 (Doc. Nos. 10, 11). For the reasons stated below, this Court

denies Plaintiff's motion for summary judgment and grants Defendant's motion
for summary judgment.

## BACKGROUND

## I.     Procedural History

Plaintiff filed an application for disability insurance benefits ("DIB") on
November 16, 2005, alleging a disability onset date of February 2, 2005.  (Tr.
100–05.)[1]  She filed a second DIB application and an application for
supplemental security income on March 7, 2006.  (Tr. 106–14.)  The applications
were denied initially and on reconsideration.  (Tr. 60–64, 71–73.)  Plaintiff timely
requested a hearing, which was held before an Administrative Law Judge ("ALJ")
on October 24, 2008.  (Tr. 74, 30–55.)  On January 22, 2009, the ALJ issued an
unfavorable decision.  (Tr. 12–28.)  Plaintiff sought review of the ALJ's decision,
but the Appeals Council denied the request for review on October 22, 2010.
(Tr. 1–5.)  The denial of review made the ALJ's decision the final decision of the
Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928
(8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822–23 (8th Cir. 1992).

On December 13, 2010, Plaintiff filed the instant action with this Court
seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The

---

[1]     Throughout this Order, reference to the Administrative Record (Doc. No.
9), for this case is made by using the abbreviation "Tr."

parties thereafter filed cross–motions for summary judgment.  *See* D. Minn. Loc. R. 7.2.

## II.   Statement of Facts

Plaintiff was born on November 27, 1979.  (Tr. 100.)  At the time of her alleged onset of disability on February 2, 2005, she was 25-years-old.  Plaintiff completed two years of college.  (Tr. 149.)  She has work experience in the following occupations:  phone order clerk, at a semiskilled and sedentary exertional level; data entry clerk, at a semiskilled and sedentary exertional level; photo finishing, at an unskilled and light exertional level; and tutor at a skilled and light exertional level.  (Tr. 211.)  Plaintiff alleged that multiple sclerosis ("MS"), fatigue and depression prevent her from working.  (Tr. 142.)

On December 7, 2004, Plaintiff saw Dr. Katherine Shin, an ophthalmologist at Affiliated Community Medical Centers, for left eye symptoms that could be consistent with demyelination.[2]  (Tr. 290, 277).  Dr. Shin referred Plaintiff to Neurologist Merlin Nelson.  (Tr. 278.)  Dr. Nelson noted Plaintiff's symptoms were left eye vision cloudiness, migraines, and frequent neck and back pain that was not severe.  (*Id.*)  Plaintiff also admitted to mild depression and difficulty sleeping, which was only "a small problem."  (*Id.*)  Plaintiff's MRI showed two lesions, but she did not meet the criteria for multiple sclerosis.  (*Id.*)

---

[2]     Demyelination is destruction, removal or loss of the myelin sheath of a nerve. *Dorland's Illustrated Medical Dictionary* 493 (31st ed. 2007).

On January 5, 2005, Plaintiff complained of a headache lasting two weeks, with fluctuation and mild discomfort.  (Tr. 229–30.)  Dr. Robert Hodapp at Affiliated Community Medical Centers treated Plaintiff with Toradol and prescribed Naproxen and Fioricet for severe pain.  (Tr. 229.)  Plaintiff was treated for migraine again a few days later and was prescribed Imitrex and Topamax for prevention.  (Tr. 270.)

The next month, Plaintiff experienced pain with movement of the left eye. (Tr. 216.)  Dr. Nelson ordered an MRI of the cervical spine to look for evidence of demyelinating plaque.  (Tr. 218.)  The impression from the MRI was "enhancing intramedullary T2 hyperintensity at the C7 level with mild cord expansion, most likely consideration is demyelination including MS."  (Tr. 296.)   After other MS mimics were excluded, Plaintiff was diagnosed with multiple sclerosis.  (Tr. 263.) Plaintiff treatment began with Rebif.[3]  (*Id.*)

Plaintiff was treated for tingling and numbness in the legs and hands in March 2005.  (Tr. 262.)  Dr. Nelson prescribed a five–day course of IV–steroids, followed by a Prednisone taper.  (Tr. 260.)  His diagnosis was "clinically definite multiple sclerosis, evidenced by two clinical events, separated in space and time, supported by MRI data as well as spinal fluid, now with a relapse, most likely from spinal cord plaque."  (*Id.*)

---

[3]    Rebif is indicated for the treatment of relapsing multiple sclerosis to decrease the frequency of clinical excerbations.  *Physician's Desk Reference* 1071 (65th ed. 2011).

On May 2, 2005, Plaintiff was doing very well, with no recurrence of MS symptoms, and her intermittent headaches were relieved within fifteen minutes of using Imitrex. (Tr. 257.) Plaintiff had some temporary side effects of a flu–like illness after having an injection of Rebif. (Tr. 228.)

Plaintiff was treated for a headache lasting more than a week in June 2005. (Tr. 256.) Imitrex helped with the severity of her headache, but the headache returned each morning. (*Id.*) Plaintiff had no recurrence of any MS symptoms at that time. (*Id.*) Her mental status examination, including memory and concentration, was normal. (*Id.*) Dr. Nelson treated Plaintiff's headache with DHE[4] and increased her Topamax. (Tr. 255–56.)

On October 4, 2005, Plaintiff established care with Dr. Shelly Staska at Affiliated Community Medical Centers. (Tr. 225.) Plaintiff's only concern at that time was medication management. (*Id.*) Two weeks later, Plaintiff saw Dr. Nelson for tingling and numbness of the hands and feet, which had lasted several days. (Tr. 253.) Plaintiff's sensory examination revealed some reduction in vibrational sense. (Tr. 252.) On mental status examination, Plaintiff was awake, alert, oriented, and exhibited normal memory and concentration. (Tr. 253.) Dr. Nelson diagnosed MS with mild relapsing sensory symptoms, which he treated with steroids. (Tr. 252.) Later that month, Plaintiff had increasing

---

[4]     DHE stands for dihydroergotamine and is used to treat migraine and cluster headaches. http://www.medicinenet.com/dihydroergotamine-injectable/article.htm (last visited 12/8/2011).

numbness in her hands and feet for several days.  (Tr. 549.)  Dr. Nelson again treated Plaintiff with steroids.  (Tr. 548.)

Plaintiff had another relapse of multiple sclerosis, but she felt completely back to normal on December 5, 2005.  (Tr. 251.)  Plaintiff also reported having very few headaches, once or twice a month.  (*Id.*)  On mental status examination, Plaintiff was awake, alert and oriented, with normal memory and concentration. (*Id.*)  Dr. Nelson stated that "[s]he has been fortunate she has no residual and her exam looks very good except for maybe a little bit of hyperreflexia."  (Tr. 250.)  He ordered MRIs of the brain and C-spine.  (*Id.*)

On February 2, 2006, Plaintiff had a two week history of migraine headache, which did not resolve with Imitrex.  (Tr. 249.)  Her headache resolved after treatment with Toradol, Reglan, and DHE.  (Tr. 248.)  However, she returned the next day needing treatment for another headache.  (Tr. 283.)

An MRI of Plaintiff's cervical spine on March 6, 2006, indicated near complete resolution of the lesion in the cord at the level of C7.  (Tr. 482.)  An MRI of Plaintiff's brain on the same day showed a single definite lesion and possibly two or three new small lesions, which were too subtle to be definite findings.  (Tr. 483.)  The next week, Plaintiff reported numbness and tingling in her hands lasting a couple of days, but it was not a problem for her.  (Tr. 544.)  She was fatigued, but this was relieved by napping.  (*Id.*)  Plaintiff had increasing headaches, resolved with Imitrex.  (*Id.*)

6

Plaintiff saw Dr. Nelson on June 1, 2006, because she was having achiness in her arms for several days with a slightly increased sense of general numbness.  (Tr. 339.)  There were no objective physical findings on examination.  (Tr. 338.)  On mental status examination, Plaintiff was awake, alert, oriented and exhibited normal memory and concentration.  (*Id.*)  Dr. Nelson prescribed a course of IV steroids.  (*Id.*)

Plaintiff had applied for social security disability, and a state agency consulting physician, Dr. Mario Zarama, reviewed Plaintiff's records and completed a Physical Residual Functional Capacity form at the request of the SSA on June 23, 2006.  (Tr. 314–21.)  Dr. Zarama opined that Plaintiff had the ability to lift and carry twenty pounds occasionally and ten pounds frequently, stand, walk, and/or sit six hours in an eight-hour workday, with no other limitations.  (Tr. 315–18.)

Next, Plaintiff underwent a psychological consultative examination with Dr. Philip Sarff on August 15, 2006.  (Tr. 341–45.)  Dr. Sarff noted that Plaintiff had an Associate's degree in Communication, and her most recent employment was as a sales representative for a printing company.  (Tr. 341.)  Plaintiff quit her job to stay home with her baby, who was now two-and-a-half-years-old.  (*Id.*)  Dr. Sarff noted that Plaintiff had no intention of working "at this time" primarily due to her physical limitations associated with MS.  (Tr. 342.)

Plaintiff reported to Dr. Sarff that she was diagnosed with MS nine months after her son was born, and she relapsed every three or four months.  (*Id.*)  Her primary symptoms were fatigue, tingling sensations, achiness and tremors.  (*Id.*)  She also had weekly migraines that could last up to three days.  (*Id.*)  Plaintiff had some difficulty sleeping, and her energy level was quite low.  (Tr. 343.)  She napped during the day.  (*Id.*)  She was easily distracted, and she forgot things people told her.  (*Id.*)  She was hopeless at times about her physical condition and tended to worry too much.  (*Id.*)

Based on the mental status examination, Dr. Sarff concluded that Plaintiff's concentration appeared to be below average, her short–term memory skills were low–average and her intelligence was likely average.  (*Id.*)  Plaintiff reported her level of functioning as follows.  She could groom and dress daily but was sometimes tired to the point of needing help showering and dressing.  (*Id.*)  She cooked for herself and family but made simple food if she was tired.  (*Id.*)  She washed dishes daily, did laundry, and cleaned the house but with frequent rest breaks and leaving things for her husband to finish.  (Tr. 344.)  She was able to drive, and her activities included reading, volunteering at church, watching television, listening to the radio, and having people over to visit.  (*Id.*)  Her typical day included caring for her son and napping in the afternoon.  (*Id.*)  She went swimming for 30–45 minutes a day and showered before dinner.  (*Id.*)  After

watching television or playing a game, she went to bed between 8:30 and 10:30p.m. (*Id.*)

Dr. Sarff diagnosed cognitive disorder, NOS, provisional and mild; and he assessed a GAF score of 65.[5] (*Id.*) He opined that Plaintiff was capable of understanding and following simple and repetitive directions and not likely to have difficulty remembering directions over time. (Tr. 345.) Her ability to handle stress would depend significantly on her physical status on a given day. (*Id.*)

Dr. James Alsdurf completed a Psychiatric Review Technique Form and a Mental RFC Assessment form on August 18, 2006, to evaluate Plaintiff's application for social security disability. (Tr. 355–68.) Dr. Alsdurf opined Plaintiff could concentrate on, understand, remember and carry out routine, repetitive three to four step tasks, and could handle the routine stressors of such work, with superficial contact with co–workers and the public. (Tr. 371.) Dr. R. Owen Nelson affirmed Dr. Alsdurf's opinion on November 1, 2006. (Tr. 376–78.)

---

[5]     The Global Assessment of Functioning Scale ("GAF") is used to report "the clinician's judgment of the individual's overall level of functioning." *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") (4th ed. text revision 2000)). GAF scores of 61-70 indicate some "mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft from within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV-tr* at 34.

Plaintiff followed up with her neurologist on September 25, 2006, and her symptoms were pain and tingling in her arms and legs, "fatigue [was] sometimes a bother," and she had fairly frequent migraine headaches. (Tr. 337.) On mental status examination, Plaintiff was awake, alert and oriented and exhibited normal memory and concentration. (Tr. 336.) Dr. Nelson concluded that Plaintiff's multiple sclerosis was doing well, and she should continue her medication regimen for migraine headaches. (*Id.*)

Two weeks later, Plaintiff reported that Naproxen and Ibuprofen were not helping her pain. (Tr. 419.) The pain started several months earlier and was affecting her ability to sleep. (*Id.*) Dr. Staska noted that Dr. Nelson did not feel the pain was related to multiple sclerosis. (*Id.*) Plaintiff's mother had fibromyalgia, but Plaintiff had not been diagnosed with it. (*Id.*) Dr. Staska ordered testing for arthritis, and noted if the testing was negative, Plaintiff might have fibromyalgia. (Tr. 418.)

When Plaintiff saw Dr. Nelson on March 26, 2007, she reported having three to four headaches a month, which were relieved with Imitrex. (Tr. 537.) She did not have relapsing multiple sclerosis symptoms. (*Id.*) Her mental status examination was normal, and her physical examination was benign. (Tr. 536–37.)

Plaintiff was having tingling in her hands and feet and a painful tightness in her lower body when she saw Dr. Nelson on July 2, 2007, and her reflexes were

reduced.  (Tr. 534–35.)  The next day, an MRI of Plaintiff's brain showed multiple small, nonenhancing frontal lobe white matter lesions, stable in size and appearance since the previous study.  (Tr. 480.)  The findings were consistent with a clinical history of demyelinating disease but negative for active demyelination or new lesions.  (*Id.*)  Plaintiff also had an MRI of the cervical spine, showing no abnormal enhancement in the cervical spine, and decreasing size of the cord signal abnormality at C7 since the last study.  (Tr. 481.)

When Plaintiff had a physical examination on July 16, 2007, she reported that she started Amitriptyline a year ago and it worked really well for her sleep until the last few months, when she had trouble falling asleep and staying asleep. (Tr. 415.)  Dr. Staska increased the dosage.  (Tr. 413.)

Plaintiff followed up with Dr. Nelson on October 1, 2007.  (Tr. 533.) Several weeks earlier, she had an episode of what sounded like an incomplete myelitis, which improved with steroid treatment, and there were no residual symptoms or worsening of lesions on MRI.  (*Id.*)  Plaintiff's physical and mental status examinations were normal.  (*Id.*)

In May 2008, Plaintiff's depression was worsening, so she sought treatment from Dr. Staska.  (Tr. 408–09.)  Plaintiff scored 11 on the PHQ–9.[6] (*Id.*)  At that time, Plaintiff's multiple sclerosis was stable.  (Tr. 408.)  Plaintiff did

---

[6]     PHQ-9 stands for Personal Health Questionnaire Depression Scale. http://patienteducation.stanford.edu/research/phq.pdf (last visited 12/8/2011).  A score of 15 or greater is considered major depression.  *Id.*

not believe the medication Lyrica was helping her, and she was having side effects.  (Tr. 409.)  Dr. Staska replaced Lyrica with Cymbalta and Trazadone. (*Id.*)  On May 30, 2008, Plaintiff reported feeling much better after starting Cymbalta and Trazadone.  (Tr. 397.*)*

Plaintiff had not had any relapsing symptoms of MS for six months when she saw Dr. Nelson in follow up on April 9, 2008.  (Tr. 441.)  She had some intermittent headaches, but they were relieved with Imitrex.  (*Id.*)  Plaintiff's mental status examination was normal.  (*Id.*)  There were no residual signs or symptoms of MS.  (Tr. 442.)

When Plaintiff had a physical examination on July 3, 2008, she was described as "doing very, very well."  (Tr. 392.)  She had recently started Cymbalta and was feeling the best she had in quite a while.  (*Id.*)  Dr. Staska noted that Plaintiff exercised five or six days a week for an hour at a time.  (Tr. 393.)  Psychiatrically, Plaintiff was "feeling very well."  (*Id.*)

Plaintiff was referred to Psychologist Kristi Phillips for psychological evaluation on August 4, 2008.  (Tr. 607–10.)  On a scale of one to ten, Plaintiff rated her depression as three, anxiety as three and anger as two.  (Tr. 608.) Plaintiff's symptoms were depressed mood nearly every day, difficulty sleeping, psychomotor agitation, fatigue and loss of energy.  (*Id.*)  Her symptoms of anxiety were sweating, trembling, shaking, shortness of breath, smothered feeling when anxious, chest pain, nausea, feeling of unreality, numbness and chills, irritability

and muscle tension. (*Id.*) Plaintiff's mental status examination was normal. (Tr. 608–09.) Dr. Phillips diagnosed major depressive disorder, mild; and she assessed a GAF score of 65. (Tr. 609.) Plaintiff's mood was good and her affect was bright when she saw Dr. Phillips for psychotherapy two weeks later. (Tr. 611.)

On September 18, 2008, Plaintiff reported to Dr. Staska that Cymbalta was overall helping her with depression and fibromyalgia, but she still had aching pain two days a week, varying in severity from "not too bad" to "quite bad." (Tr. 387.) Plaintiff also reported that Trazadone helped her fall asleep, but she could not stay asleep, which made her fibromyalgia worse. (*Id.*) Dr. Staska recommended that Plaintiff use Naproxen when her fibromyalgia flare was not too bad and use Tylenol #3 for really bad days. (Tr. 388.) Dr. Staska also prescribed Ambien to replace Trazadone. (*Id.*)

On October 29, 2008, Dr. Nelson saw Plaintiff and completed a questionnaire regarding her disability. (Tr. 620.) Dr. Nelson noted that Plaintiff had minimal residual effects from multiple sclerosis, and her overwhelming problem was fatigue, which was caused by fibromyalgia, depression and multiple sclerosis. (*Id.*) Dr. Nelson opined that pain, fatigue or other symptoms would frequently interfere with Plaintiff's attention and concentration, and Plaintiff was incapable of even low stress jobs. (Tr. 616.) Dr. Nelson explained that his opinion was based on "ask[ing] [the] patient." (*Id.*) He also stated that Plaintiff

13

did not have exacerbations of multiple sclerosis in the past year.  (Tr. 615.)   Dr. Nelson indicated that Plaintiff was not a malingerer.  (Tr. 614.)

Dr. Nelson assigned Plaintiff the following functional limitations:  walk two blocks without rest; sit for thirty minutes; stand for five minutes; sit, stand and/or walk less than two hours each per day; rarely lift ten pounds or more; and occasionally twist and stoop.  (Tr. 616–18.)  He also indicated Plaintiff would need a job that permitted shifting positions at will, and she would need to take unscheduled breaks during an eight–hour workday.  (Tr. 617.)  Plaintiff would need to avoid even moderate exposure to extreme heat, fumes, odors, gases, dust and poor ventilation due to migraines.  (Tr. 619.)  Dr. Nelson opined that Plaintiff's impairments would cause her to miss more than four days per month from work.  (*Id.*)

## III.   Testimony

Plaintiff testified to the following at the hearing before the ALJ on October 24, 2008.  (Tr. 32–46.)  She was 29-years-old, and she was married and had a four–year–old son.  (Tr. 32–33.)  Plaintiff explained that she could not work because she was too tired, she took two naps a day, and she had pain in her arms and legs.  (Tr. 33.)  Her daily routine was to get up at 7:00 a.m., get her son ready, and take him to preschool twice a week.  (Tr. 34.)  She took a nap in the morning, or if her son was home, she put on a movie so she could rest.  (Tr. 34.)  She made a simple lunch and napped again in the afternoon, then did the dishes.

14

(*Id.*)  Her husband got home at 2:30 and did the rest of the cleaning and watched their son.  (Tr. 35.)  If she was having a good day, she would make dinner.  (*Id.*)  After dinner, they played a game, and Plaintiff went to bed around 8:30.  (*Id.*)  Plaintiff went to a bible study twice a month, and sometimes went to church.  (*Id.*)

Plaintiff has a high school education and two years of college.  (Tr. 36.)  In college, she worked as a tutor for six months, one day a week.  (Tr. 37.)  She had other jobs after college but quit working in February 2005, when she had blurred vision in her left eye.  (Tr. 37–38.)  Dr. Nelson ultimately diagnosed her with MS.  (Tr. 38–39.)  Since then, her symptoms were pain, fatigue, tingling and numbness.  (Tr. 39.)  Plaintiff experienced some depression, but it took her some time to see a psychologist, because there are not many in her area.  (Tr. 40.)

Plaintiff had two to four good days a week when she was able to do more cooking and cleaning.  (Tr. 41.)  If she did too much, she did not feel well the next day.  (*Id.*)  In the last year, Plaintiff spent five or six days in bed.  (Tr. 42.)  Usually, she spent seven or eight hours a day lying on her couch.  (Tr. 43.)

Plaintiff had some flu–like symptoms from the medication Rebif.  (Tr. 43–44.)  When she had a relapse of MS symptoms, she was treated with IV steroids, and her symptoms returned to baseline.  (Tr. 44–45.)

Dr. Andrew Steiner testified as a medical expert at the hearing.  (Tr. 46–48.)  He reviewed the objective medical findings and opined that Plaintiff would be limited to a sedentary exertional level of work.  (*Id.*)

Steve Bosch testified at the hearing as a vocational expert.  (Tr. 211, 48–51.)  The ALJ asked Bosch a hypothetical question about the type of work a person with the following characteristics could perform:  a younger person with a high school education, limited to simple, routine work "at a sit–down" level.  (Tr. 49.)  Bosch testified such a person could not perform Plaintiff's past relevant work but could perform other jobs including optical assembly, Dictionary of Occupational Titles ("DOT") Code 713.687–018, with 1,800 such jobs in Minnesota; and electronic assembly, DOT Code 726.685–066, with 5,000 such jobs at the sedentary level.  (Tr. 50.)  If such a person were also restricted to no high production goals or quotas, the assembly jobs would be eliminated.  (*Id.*)  Missing two days of work a month would preclude performing the assembly jobs, as would the need to take unscheduled breaks.  (Tr. 51.)

## IV.   The ALJ's Findings and Decision

On January 22, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act at any time from February 2, 2005, through the date of the decision, therefore denying Plaintiff's applications for disability insurance benefits and supplemental security income. (Tr. 12–28.)  The ALJ followed the five–step procedure as set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit Court of Appeals has summarized the five-step procedure as follows:  (1) whether the claimant is currently engaged in "substantial gainful

16

activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 2, 2005, therefore meeting the requirement at the first step of the disability determination procedure. (Tr. 17.) At step two, the ALJ found that Plaintiff had severe impairments of multiple sclerosis, fibromyalgia symptoms, and major depressive disorder, mild. (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18–19.) Based on Plaintiff's mental impairment, the ALJ concluded that Plaintiff had a mild restriction in activities of daily living, mild difficulty in social functioning and mild to moderate difficulties with concentration, persistence or pace. (Tr. 18.) Plaintiff

17

had no episodes of decompensation of extended duration.  (*Id.*)  The ALJ also
concluded the "C criteria" of the listing were not met.  (*Id.*)

At step four of the disability determination procedure, the ALJ determined
that Plaintiff had the residual functional capacity to perform a full range of
unskilled, sedentary exertional work as defined under the regulations.  (Tr. 19.)
In reaching this conclusion, the ALJ summarized Plaintiff's hearing testimony.
(Tr. 20.)  Then, after summarizing the evidence of record, the ALJ concluded that
Plaintiff's allegations of disabling pain and mental limitations were inconsistent
with the objective medical evidence and the records from treating and examining
physicians, noting that Plaintiff's MS relapses and migraine headaches resolved
with medication.  (*Id.*)  The medication Cymbalta was helpful in reducing
Plaintiff's depression and fibromyalgia symptoms.  (Tr. 22.)  Although Plaintiff
was diagnosed with major depression, her GAF score was 65.  (*Id.*)  In
September 2008, Plaintiff reported periodic flares of fibromyalgia, and she was
prescribed Tylenol #3 for bad flares and Ambien for sleep.  (Tr. 22–23.)

The ALJ stated that the objective evidence did not support an allegation of
severe, unremitting pain or debilitating mental functioning.  (Tr. 23.)  There was
minimal information in the record regarding depression.  (*Id.*)  The ALJ also found
it significant that none of Plaintiff's treating providers indicated that she was
unable to sustain substantial gainful employment or restricted her from any daily
activities on a consistent, long-term basis.  (*Id.*)  The ALJ noted Dr. Nelson's

18

comment that Plaintiff was fortunate not to have residual from her MS, other than a little bit of hyperreflexia. (*Id.*)  The ALJ also reviewed Dr. Sarff's opinion of Plaintiff's ability to perform simple, repetitive work, and gave it significant weight, and he also gave significant weight to the state agency psychologist's opinion that Plaintiff was capable of work involving routine, repetitive, 3–4 step limited detail instructions with superficial contacts with coworkers and the public, and incorporated most of the limitations in his RFC finding.  (Tr. 24.)  He reviewed Dr. Steiner's opinion and gave it significant weight because it was consistent with and supported by the overall evidence of record.  (*Id.*)

Next, the ALJ thoroughly reviewed Plaintiff's medications and found nothing about her use of medications that would preclude performing the type of work described in the RFC finding.  (Tr. 24–25.)  He also found Plaintiff's course of treatment to be completely inconsistent with her subjective complaints, because she was managed conservatively and did not require hospitalization, surgery or other invasive treatment, primarily because her MS relapses were minor and infrequent, and her depression and fibromyalgia responded to medication.  (Tr. 25.)  The ALJ found that Plaintiff was not motivated to return to work because she told the consultative psychological examiner she had no intention of returning to work due to MS, but her neurologist, Dr. Nelson, never suggested that MS would limit her ability to work.  (*Id.*)  The ALJ noted there was no evidence that Plaintiff sought job placement or retraining.  (*Id.*)

The ALJ then thoroughly reviewed evidence of Plaintiff's daily activities, and her mental status examination of August 2006.  (Tr. 26.)  The ALJ noted that in August 2008, Plaintiff's GAF score was 65.  (*Id.*)   He concluded there was nothing in the evidence to indicate Plaintiff could not care for herself or her affairs, focus and concentrate, use transportation, get along with family, and perform a wide range of activities.  (*Id.*)  He found these activities to be inconsistent with Plaintiff's allegations of incapacitating MS, pain and mental limitations.  (*Id.*)

## DISCUSSION

## I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability

benefits to a claimant is limited to a determination of whether the decision of the

Commissioner is supported by substantial evidence on the record as a whole.  42

U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is

a notable difference between 'substantial evidence' and 'substantial evidence on

the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)

(quotation omitted).  Substantial evidence is "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(quotation omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir.

2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).

"'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing

analysis."  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in

reviewing administrative findings is more than a mere search of the record for

evidence supporting the [Commissioner's] findings."  *Id.* (quotation omitted).  In

reviewing the administrative decision, "'[t]he substantiality of the evidence must

take into account whatever in the record fairly detracts from its weight.'"  *Id.*

(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not

substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210,

1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision

merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff challenges multiple aspects of the ALJ's RFC determination in support of her motion for summary judgment.  She contends that the ALJ misunderstood the symptoms of multiple sclerosis, failed to address Plaintiff's fatigue, erred in evaluating Plaintiff's use of medications, relied on inconsistent

opinions of the state agency consultants regarding Plaintiff's mental impairment,

erred in evaluating her daily activities, and erred by relying on the opinions of

nonexamining state agency consultants over Plaintiff's treating physicians.

Plaintiff also contends the ALJ should have contacted Dr. Nelson to clarify his

RFC opinion rather than discounting it.  Plaintiff concludes that because the

ALJ's RFC was faulty, the hypothetical question posed to the vocational expert

was improper, and the VE's testimony does not constitute substantial evidence

upon which the ALJ may rely.

The Commissioner asserts the ALJ did not fail to weigh Dr. Nelson's

opinion, because the RFC questionnaire Dr. Nelson completed did not reflect his

opinion – his responses on the questionnaire were only Plaintiff's subjective

reports.  Furthermore, the Commissioner contends that the responses on the

questionnaire were not consistent with Dr. Nelson's treatment records.  The

Commissioner also argues that the ALJ did not rely on inconsistent opinions from

the state agency consultants, Drs. Alsdurf and Sarff, because they both

determined that Thiele could perform simple, repetitive work.

The ALJ's credibility determination, the Commissioner asserts, was

properly based on his finding that Plaintiff's MS was adequately controlled by

medication and was in remission the majority of the time, and Plaintiff had only

sparse, conservative treatment for depression.  Furthermore, Plaintiff's care of

her child, household chores, and church activities are inconsistent with disability,

and the ALJ understandably suspected Plaintiff was not motivated to return to work, given her employment history.   Therefore, the Commissioner contends the ALJ's RFC finding was the proper basis for the hypothetical question to the vocational expert, and the VE's testimony was substantial evidence supporting the ALJ's determination that Plaintiff was capable of performing other work existing in significant numbers in the regional economy.

In reply, Plaintiff asserts the ALJ cannot rely on occasional statements by her physicians that she was doing well, because doing well in the context of multiple sclerosis does not equate to the ability to work.

### A.   RFC Determination

"When determining a claimant's RFC, the ALJ should consider all relevant evidence, including medical records, the observations of doctors and third parties, and the claimant's own descriptions."   *Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004).

### 1.   Evaluation of Medical Opinions

In making an RFC determination, the ALJ must evaluate every medical opinion.   20 C.F.R. §§ 404.1527(d), 416.927(d).   The ALJ should give a treating source's RFC opinion controlling weight if it is "well–supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.   20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009) (quoting

*Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007).  If the treating source's opinion is not entitled to controlling weight, the ALJ must apply the following factors in weighing the various medical opinions:   1) examining relations; 2) treating relations; 3) supportability; 4) consistency; 5) specialization; 5) any other factors that tend to support or contradict the opinion.  20 C.F.R. §§  404.1527(d)(2)(i), (ii), 416.927(d)(2)(i), (ii); *Heino*, 578 F.3d at 879 (quoting *Wagner*, 499 F.3d at 848).  "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain . . . the weight given to the opinions of a State agency medical or psychological consultant."  20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii); *Wilcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008).

The opinion of a nonexamining physician, standing alone, does not constitute substantial evidence in the record in the face of a conflicting assessment of a treating physician.  *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).  However, if the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002).

Plaintiff cites outside medical sources for the proposition that the ALJ misunderstood the nature of MS, including:  1) 20% of MS patients find pain to be

a significant problem; 2) MS is chronic, not acute, and usually does not require emergency room treatment; 3) chronic stress accompanies MS and may result in decompensation and maladaptation; 4) fatigue is present at some time in most MS patients and may be seen without neurological findings. The issue before the ALJ was not whether MS could be disabling, but whether it is disabling in Plaintiff's case, in combination with her other impairments. *See Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011) (stating that the critical question was not whether complaints were consistent with description of illness in medical authorities, but whether claimant's illness had progressed to disability.) MS may cause pain, but Dr. Nelson did not believe Plaintiff's achiness was caused by MS. (Tr. 419.) Instead, Plaintiff was diagnosed with fibromyalgia, which was managed with Cymbalta. (Tr. 418, 392.)

It is true that the ALJ noted Plaintiff did not require hospitalization for treatment of MS, and this is an insufficient reason alone to find that her MS was not severe enough to result in disability. However, the record, as summarized by the ALJ, is replete with evidence that Plaintiff's MS was mild and not very limiting of her functioning. For example, Dr. Nelson stated, "[s]he has been fortunate she has no residual and her exam looks very good except for maybe a little bit of hyperreflexia." (Tr. 250.) In March 2006, Plaintiff reported numbness and tingling in her hands lasting a couple of days, but it was not a problem for her.

26

(Tr. 544.)  Plaintiff had not had any relapsing symptoms of MS for six months when she saw Dr. Nelson in follow up on April 9, 2008.  (Tr. 441.)

Similarly, the evidence indicates that Plaintiff's depression and anxiety were mild.  In July 2008, Plaintiff rated her depression and anxiety three out of ten in severity.  (Tr. 608.)  Although MS and fibromyalgia can result in fatigue, Plaintiff only reported fatigue twice.  The first time she reported being fatigued, she said it was relieved by napping.  (Tr. 544.)  The second time she described being fatigued, she said it was "sometimes a bother."  (Tr. 337.)  Fatigue may be expected to affect mental functioning, but Plaintiff's numerous mental status examinations by treating physicians were normal, she appeared alert and oriented, and no medical provider noted her appearing tired.  (Tr. 251, 253, 255–56, 336, 338, 441, 533, 536–37, 608–09.)  In summary, the evidence supports the ALJ's evaluation of the severity of Plaintiff's MS related symptoms.

Plaintiff asserts the ALJ erred by relying on the opinions of state agency consultants, whose opinions do not constitute substantial evidence when contradicted by a treating physician's opinion.  The ALJ adopted the medical expert's opinion that Plaintiff can perform sedentary exertional level work and discounted Dr. Nelson's opinion that Plaintiff was not capable of even low stress jobs, was limited to less than sedentary exertional work, would require unscheduled breaks, and would miss more than four days of work per month.  As the Court noted above, the ALJ cannot rely solely on a nonexamining physician's

27

opinion when there is a contrary opinion from a treating physician, unless the ALJ conducted an independent review of the medical evidence and gave reasons to discount the treating physician's opinion.  The ALJ did so here.  The ALJ noted that Dr. Nelson's opinion was explicitly based on Plaintiff's subjective report of her abilities.  Such an opinion is of limited evidentiary value, especially if it is inconsistent with the physician's treatment notes.  *See Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (stating that on RFC questionnaire, physician responded to "ask the patient" about her specific limitations, and other substantial evidence was inconsistent with RFC assessment).  In his treatment records, Dr. Nelson did not note any limitations on Plaintiff's ability to sit, stand, walk or lift, which is not surprising because he found only intermittent mild symptoms of MS, which were relieved with steroid treatment.

In review of Dr. Nelson's treatment notes, the Court notes Dr. Nelson did not indicate that Plaintiff's functioning was limited by fatigue, and Plaintiff only reported fatigue on two occasions.  Objectively, Plaintiff's alertness, concentration and memory were normal on the occasions when she visited Dr. Nelson.  When Plaintiff first complained of difficulty sleeping, in December 2004, she said this was only a small problem.  (Tr. 278.)  Plaintiff did not raise the issue of fatigue again until March 2006, and the record indicates only that Plaintiff reported having fatigue that was relieved by napping.  (Tr. 544.)  In September 2006, Plaintiff described her fatigue as "sometimes a bother."  (Tr. 337.)  In July

2007, Plaintiff said Amitriptyline was not working as well as it had for the last year to help her sleep, and the dosage was increased.  (Tr. 415.)  In May 2008, Plaintiff started treatment with Cymbalta and Trazadone for pain and difficulty sleeping, and by July, she felt "very well."  (Tr. 392–93.)  In September 2008, Trazadone was not helping Plaintiff stay asleep, so Dr. Staska prescribed Ambien.  (Tr. 388.)  Plaintiff's complaints of fatigue and difficulty sleeping were infrequent and usually resolved with medication.  Thus, the evidence in the record as a whole is inconsistent with Dr. Nelson's responses on the RFC questionnaire.  Instead, the evidence discussed above supports the ALJ's RFC finding for sedentary exertional work, and the ALJ did not err in adopting Dr. Steiner's physical RFC opinion.  There was no requirement for the ALJ to recontact Dr. Nelson about Plaintiff's MS symptoms or fatigue specifically, because the evidence of record provided an adequate basis for the ALJ to make a proper disability determination.  *See Sultan v. Barnhart*, 268 F.3d 857, 863 (8th Cir. 2004) (citing 20 C.F.R. §§ 416.912(e), 919a(b)).

Plaintiff also asserts the ALJ relied on inconsistent mental RFC opinions of state agency consulting physicians without resolving their inconsistencies. Plaintiff points out that Dr. Alsdurf found her ability to concentrate "not significantly limited," but Dr. Sarff found her ability to concentrate to be below average.  But ultimately Dr. Sarff, like Dr. Alsdurf, opined that Plaintiff was capable of simple, routine work.  And to the extent the ALJ had specifically

29

compared the ratings of Plaintiff's ability to concentrate, the overall record would have supported Dr. Alsdurf's opinion of "not significantly limited," because Dr. Sarff was the only medical provider to find Plaintiff's concentration to be below average. Her concentration on every mental status examination by a treating provider was normal.

The Court also notes that Dr. Alsdurf opined that Plaintiff could handle the ordinary stress of routine, repetitive work, and Dr. Sarff stated that Plaintiff's ability to handle stress would depend on her physical status on a given day. There is nothing per se inconsistent about these opinions. As discussed above, the record of Plaintiff's physical symptoms does not support such frequency and severity as to interrupt concentration for simple, routine work. Plaintiff's ability to perform her daily routine of caring for herself, her preschool-age son, and to do limited housework and volunteer at church also supports this conclusion. *See Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (finding that ability to care for eleven-year-old, drive, fix simple meals, do housework, shop for groceries and handle money inconsistent with complaint of inability to concentrate, remember, and follow directions make plaintiff's statements regarding her inability to work not credible).

### 2.    Credibility Evaluation

A claimant's subjective complaints cannot be disregarded solely because there is a lack of supporting objective medical evidence, but they can be

discounted if there are inconsistencies in the record as a whole.  *Zeiler*, 384 F.3d

at 936.  "[T]he ALJ must consider all the evidence relating to the claimant's

subjective complaints, including his previous work record, and observations by

third parties and treating and examining physicians relating to his daily activities;

the duration, frequency and intensity of his pain; precipitating and aggravating

factors; dosage, effectiveness and side effects of medication, and functional

restrictions.  *Jones v. Callahan*, 122 F.3d 1148, 1151 (8th Cir. 1997) (citing

*Polaski v. Heckler*, 751 F.2d 943, 948–50) (8th Cir. 1994) (reinstated by *Polaski

v. Heckler*, 804 F.2d 456, 457 (8th Cir. 1996)).  If the ALJ gives good reasons for

explicitly discounting the claimant's testimony, courts will normally defer to the

ALJ's credibility determination.  *Boettcher v. Astrue*, 652 F.3d 860, 864 (8th Cir.

2011).

Plaintiff argues the ALJ erred in discounting her subjective complaints on

the basis that she did not require narcotics or long term steroids to manage her

pain or MS flares, because MS is commonly treated with short term use of

steroids.  The Court disagrees.  The fact that Plaintiff's short-term steroid

treatment was effective in resolving her intermittent and mild flares of MS

symptoms is inconsistent with her testimony about the severity of her symptoms.

*See Johnson*, 628 F.3d at 993, 995–96 (finding that steroid treatment that

resulted in marked improvement, and entries in treatment records such as "no

joint swelling," "no other complaints," or "doing well" were inconsistent with subjective complaints of disabling pain and fatigue).

Plaintiff also asserts the ALJ erred by discounting her subjective complaints of depression because she did not seek regular treatment for depression.  Instead, Plaintiff asserts the ALJ should have considered her explanation that she could not find a therapist in her area until 2008.  Even if the ALJ accepted this explanation, there is evidence that Plaintiff's depression was only mild or controlled by medication, before she started therapy in 2008.  In December 2004, Plaintiff admitted to mild depression.  (Tr. 278.)  In August 2006, Plaintiff told Dr. Sarff she was not working primarily due to her physical limitations, and Dr. Sarff diagnosed cognitive disorder, not depression.  (Tr. 344.)  He also assigned Plaintiff a GAF score of 65, indicating only mild mental symptoms.  (*Id.*)

Plaintiff did not complain of worsening depression to a treating physician until May 2008, and by the end of May, the medication Cymbalta had improved her depression.  (Tr. 397.)  In July, Plaintiff was "feeling very well" psychiatrically.  (Tr. 393.)  The next month, August 2008, was Plaintiff's first evaluation with Psychologist Kristi Phillips for depression and anxiety.  (Tr. 607–610.)  Plaintiff was diagnosed with mild depression, and a GAF score of 65, indicating only mild symptoms.  (Tr. 609.)  Therefore, the record fully supports discounting Plaintiff's subjective mental complaints.

Finally, Plaintiff challenges the ALJ's evaluation of her credibility based on her daily activities.  Plaintiff argues her daily activities do not equate to the ability to work a full–time job on a sustained basis.   The Court disagrees.  Here, in addition to doing housework, Plaintiff cared for her four–year–old son, took him to school, and took him swimming regularly.  (Tr. 344.)  The record also indicates that Plaintiff told Dr. Sarff that she quit her job to stay home with her baby, and she had no intention of returning to work because of her MS symptoms.  (Tr. 341–42.)  In light of the record of mild and intermittent MS symptoms here, Plaintiff's motivation to return to work is questionable, and the ALJ did not err in finding Plaintiff's daily activities inconsistent with her subjective complaints.  The ALJ gave sufficiently good reasons of the effectiveness of treatment, motivation to return to work, and daily activities for discounting Plaintiff's subjective complaints, and his RFC determination should be affirmed.

### B.    Hypothetical Question to the Vocational Expert

Plaintiff contends that the ALJ posed a faulty hypothetical question to the vocational expert regarding her functional abilities and that the VE's testimony therefore does not support the ALJ's disability determination.   Where, as here, a hypothetical question includes all impairments and limitations accepted as true by the ALJ, and is supported by substantial evidence in the record, it provides a proper basis for the ALJ to rely on the VE's response to the hypothetical question.  *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001).

Therefore, the VE's testimony that Plaintiff could perform work that exists in significant numbers in the regional economy is substantial evidence supporting the ALJ's disability determination.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED THAT:**

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 12) is **DENIED**;

2.     Defendant's Motion for Summary Judgment (Doc. No.17) is

**GRANTED**;

3.     This case is **DISMISSED WITH PREJUDICE**.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Date: March 5, 2012

                                        *Jeffrey J. Keyes*_____
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge